OPINION
{¶ 1} This matter is before the Court on Appellant Susan Doran's direct appeal from a trial court order for forced medication. On April 4, 2003, Doran was indicted for aggravated arson following the burning of her fiance's home. Doran pled not guilty by reason of insanity (NGRI). That fall Doran was found NGRI and was committed to Twin Valley Behavioral Health Care. *Page 2 
 {¶ 2} In April, 2004, Doran's commitment at Twin Valley was continued for two years, and she was given some privileges. Two months later, Doran's physician took her off of all medications. By the fall of 2004, Doran was granted off-grounds, unsupervised privileges, including overnight stays (Level 5). One year later, however, those privileges were revoked. Over the course of the next year or more, Doran repeatedly sought to terminate her commitment and/or to regain Level 5 privileges. In August, 2006, the trial court again found by clear and convincing evidence that Doran remained a mentally ill person subject to hospitalization and continued her commitment for another two years.
 {¶ 3} On May 18, 2007, Doran filed another motion for temporary Level 5 privileges for a two-week period during building renovations. The following month Twin Valley filed an application for forced medications. Following a hearing, the trial court granted the request to forcibly medicate Doran. The court did not directly rule on the motion for temporary Level 5 privileges. Doran filed a timely notice of appeal along with a motion to stay the medication order, which the trial court granted.
 I {¶ 4} Doran's first assignment of error:
 {¶ 5} "Whether the Trial Court erred in issuing an Order Granting Application for Court Ordered Medication and Blood Draws from an individual found guilty (sic) by reason of insanity when the State failed to demonstrate by clear and convincing evidence that the individual remains a mentally ill person subject to hospitalization after the testimony at the hearing indicated that she posed no risk of harm to herself or others, her mental illness was in remission and she had been found competent in a *Page 3 
Probate hearing."
 {¶ 6} In her first assignment of error, Doran contends that the trial court's order to forcibly medicate her was against the manifest weight of the evidence because she is not a mentally ill person subject to court-ordered hospitalization. Although the parties argue Doran's status as a mentally ill person subject to hospitalization in their respective briefs, the record reveals that the only two issues before the trial court were Doran's request for Level 5 privileges and Twin Valley's motion for forced medication. Doran's status as a mentally ill person subject to hospitalization had been addressed less than a year before the hearing was held on these two motions, and that status was set for bi-annual review. Therefore, the court did not need to re-address the issue of Doran's status, but instead could rely on its recent finding. Accordingly, we limit our review in this assignment of error to the issue of whether an order for forced medication was against the manifest weight of the evidence.
 {¶ 7} In reviewing the appropriateness of an order for forced medication, we must review the order to determine whether it was against the manifest weight of the evidence. In re T.B., Franklin App. Nos. 06AP-1225, 06AP-1276, 07AP-97, 2007-Ohio-2360, ¶ 23. A judgment that is supported by some competent, credible evidence addressing all of the essential elements of the case will not be reversed on appeal as against the manifest weight of the evidence. Id., citing In re T.B., Franklin App. No. 06AP-769, 2006-Ohio-4789, ¶ 7, in turn citing C.E. Morris Co.v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578.
 {¶ 8} "A court may issue an order permitting hospital employees to administer antipsychotic drugs against the wishes of an involuntarily committed mentally ill person *Page 4 
if it finds by clear and convincing evidence, that (1) the patient does not have the capacity to give or withhold informed consent regarding his/her treatment, (2) it is in the patient's best interest to take the medication, i.e., the benefits outweigh the side effects, and (3) no less intrusive treatment will be as effective in treating the mental illness." Steele v. Hamilton Cty. Community Mental Health Board,90 Ohio St.3d 176, 2000-Ohio-47, paragraph 4 of the syllabus. The determination of capacity to consent to or refuse treatment "is uniquely a judicial, rather than a medical determination." Id. at paragraph 5 of the syllabus.
 {¶ 9} Dr. Naomi Bloom testified for Twin Valley in favor of forced medication. The doctor has known Doran since her admittance into Twin Valley in 2003, but did not become her treating psychiatrist until some time later. Doran was diagnosed with major depressive disorder with psychotic features, which is a recurrent condition. While it appears that Doran's psychosis is in remission, she continues to be dysfunctional and exhibits mental illness. Specifically, Doran has a personality disorder manifested by paranoia and her refusal to cooperate with her own treatment. The record is replete with evidence of Doran's paranoia, which has caused her to completely refuse to cooperate with her treatment team. Moreover, Doran's paranoia, evidenced in large part by her self-destructive behavior regarding her treatment, prevents her from being competent to make her own determinations regarding her medical treatment.
 {¶ 10} Very soon after Dr. Bloom was assigned to work with Doran, the two had a disagreement regarding the nature of Doran's commitment. Doran insisted that she was there on civil status and did not understand that she was there due to the NGRI *Page 5 
finding. The next month Doran told Dr. Bloom that she did not trust the doctor or the hospital staff.
 {¶ 11} Since that time, each week when Dr. Bloom tries to talk to Doran, she is told, "Dr. Bloom, I'm not refusing but I will not speak to you without a witness." However, when Dr. Bloom asks Doran who she would like as a witness, Doran refuses to answer. When Dr. Bloom suggests people, Doran just turns and walks away. During the hearing, Doran vaguely claimed that she refused to talk to Dr. Bloom without a witness on the advice of legal counsel, but she was unable to explain why she failed to work with the doctor to find a suitable witness. Doran also insists that Twin Valley has admitted making mistakes in her case, but she was unable to offer examples or any evidence in support.
 {¶ 12} Dr. Bloom has tried various ways to engage Doran, without success. Over the years, other members of Twin Valley's treatment staff have also failed in this regard. Although Doran can be pleasant with some of the staff on a social level, she consistently refuses to cooperate when it comes to her treatment. Without Doran's cooperation, Dr. Bloom cannot fully evaluate her, and Doran's treatment has come to a halt.
 {¶ 13} Doran further thwarts her own progress by continuing to refuse to sign releases for Twin Valley to obtain all of her previous psychiatric records. Doran maintains that previous counsel advised her not to sign any further medical releases, and she insists that Twin Valley has all of the records that it is entitled to have. Dr. Bloom disagrees. Moreover, Doran continues to refuse to cooperate in this regard, despite a 2006 order by the trial court that she sign the releases. An inability to review *Page 6 
all of Doran's psychiatric history hinders the ability of the Twin Valley staff to fully assess and serve Doran's current needs.
 {¶ 14} Doran would have the court believe that her refusal to communicate with Dr. Bloom is somehow the fault of the doctor, but there is no evidence of this. To the contrary, Doran has also refused to speak with other doctors and members of her treatment team. Although Doran claims that Twin Valley management refuses to allow her to change doctors, she concedes that she has not filed any formal complaints about Dr. Bloom. However, she insists that she has filed multiple grievances against other doctors at the facility.
 {¶ 15} Another area of concern is Doran's unexplained refusal to eat hospital food. Instead, her family and friends bring her meals to her. Because upon her initial admittance to Twin Valley Doran believed that her food was poisoned, Dr. Bloom is concerned that Doran may continue to harbor such fears.
 {¶ 16} Nevertheless, despite Doran being "very guarded and mistrustful," Dr. Bloom opined that with medication, Doran's paranoia could likely go into remission and that a working doctor-patient relationship could then be established. On the other hand, without treatment, Doran remains at risk for relapse as there is a high rate of morbidity and mortality associated with depression, with or without paranoia. In fact, Dr. Bloom described a partial relapse that Doran suffered in May, 2005. Moreover, Doran had been hospitalized for psychiatric reasons on four occasions prior to her NGRI commitment.
 {¶ 17} In short, Dr. Bloom believes that Doran is not acting in her own best interests. Although if Doran cooperated with her treatment, she could likely attain at *Page 7 
least some level of freedom from hospitalization, she consistently chooses not to avail herself of that opportunity. In fact, she actively rejects it. Doran's refusal to cooperate in any way with her treatment team is strong evidence of her paranoia and illustrates her lack of capacity to consent to or deny a particular form of medical treatment.
 {¶ 18} Victoria Campbell, a nurse who has known Doran for at least 25 years, worked at Twin Valley until May, 2005. Since that time she has maintained telephone contact with Doran. Campbell believes that Doran is "back to her old self," and she does not believe that medication is warranted. However, not only has Campbell not even seen Doran for more than two years, Campbell admits that she is not a medical doctor and that she is not qualified to prescribe medications.
 {¶ 19} Doran also called to the stand Dr. Donald Scott, a clinical psychologist who visited Doran for one hour on June 1, 2007 to evaluate whether he thought he could work with her on an outpatient basis in the future. During the interview, Dr. Scott found Doran actively involved in the interview, cooperative, and not at all depressed. Dr. Scott first stated that Doran does not need to be medicated but, on cross examination, he conceded that he is not a medical doctor and is not qualified to prescribe medications, nor can he give a qualified opinion as to whether Doran needs medication. Moreover, after a single hour with Doran, Dr. Scott is certainly not as knowledgeable about her case as Dr. Bloom is. In fact, Dr. Scott had not even spoken to Dr. Bloom or reviewed her records of Doran. Dr. Scott also acknowledged that he could not give an opinion regarding less restrictive treatments because he is not a forensic psychologist. Finally, despite his overall positive description of Doran, Dr. Scott agreed that Doran was being inflexible, maladaptive, and rigid in regards to her *Page 8 
treatment, which may be the reason for her current problems working with her treatment team, particularly Dr. Bloom.
 {¶ 20} Doran makes much of the fact that Dr. Bloom testified months earlier in Probate Court that Doran did not need a guardian because she was capable of handling her own personal affairs. However, Doran's claim overlooks the fact that an individual may be incompetent in just one or two areas of her life, but not necessarily in all areas. Steele v.Hamilton Cty. Community Mental Health Bd., 90 Ohio St.3d 176, 186,2000-Ohio-47, citations omitted. In other words, an adjudication of competency in some areas does not equate with competence in all areas. Id. Moreover, an adjudication of incompetence is not a prerequisite for the state's parens patriae power to be invoked in a forced medication case. Id. In short, the probate court's determination in a civil proceeding that Doran was competent to handle her personal affairs does not determine the issue of her capacity to consent to medical treatment.
 {¶ 21} As in most cases, the significance of witness credibility is paramount. The trial court, who heard and saw the testimony first-hand, is in the best position to evaluate the credibility of those witnesses.State v. Reynolds (April 23, 1999), Montgomery App. No. 17271. In summary, the State's evidence, particularly that of Doran's consistent and complete refusal of all medical treatment, demonstrates that she does not have the capacity to make informed decisions about that treatment. The State also showed that the benefits of the medications outweighed the inherent risks and that all attempts at less intrusive means have been unsuccessful. Therefore, we find competent, credible evidence upon which the trial court could have based its determination. Accordingly, Doran's first assignment of error will be overruled. *Page 9 
 II {¶ 22} Doran's second assignment of error:
 {¶ 23} "Whether the Trial Court erred in failing to address Appellant's Motion for Level 5 Privileges after Appellant presented substantial evidence that she was no longer a mentally ill person subject to hospitalization."
 {¶ 24} In her second assignment of error, Doran insists that the trial court erred in failing to address her petition for Level 5 privileges. Initially we note that Doran failed to offer any evidence at the hearing that she had met any of the three requirements previously set by the trial court in its nunc pro tunc August 11, 2006 order of continued commitment before it would even consider Level 5 privileges. Moreover, when a trial court does not specifically rule on a motion, the court is presumed to have overruled it. Reiger v. Reiger, Montgomery App. No. 21784, 2007-Ohio-2366, ¶ 8, citations omitted. For these reasons, Doran's second assignment of error is without merit and will be overruled.
 III {¶ 25} Having overruled both of Doran's assignments of error, the judgment of the trial court will be AFFIRMED.
 GRADY, J. and DONOVAN, J., concur. *Page 1